IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )   No. 10-cr-20357-STA/tmp |
| **MATTHEW WILLIAMS,** | ) |
| | ) |
|     **Defendant.** | ) |
| | ) |

---

**REPORT AND RECOMMENDATION**

---

Before the court by order of reference is defendant Matthew Williams's Motion to Suppress Evidence, filed on September 30, 2012. (ECF No. 74.) In his motion, Williams challenges the warrantless search of two packages by Drug Enforcement Administration ("DEA") agents, which packages contained methamphetamine. On November 16, 2012, the court held a hearing on the motion.[1] The court heard testimony from Bartlett Police Officer - DEA Task Force Agent Joshua Pike, and DEA Agent Charles Andrews, both of whom the court finds to be credible. The court also admitted as evidence photographs of the packages. For the reasons below, it is recommended that Williams's Motion to Suppress be denied.

---

[1]The suppression hearing was originally scheduled for October 29 and November 9, 2012, but was continued upon motion of the parties.

## I. PROPOSED FINDINGS OF FACT

The facts surrounding the discovery of the evidence at issue in this motion are not in dispute. In September 2009, the DEA began investigating the suspected criminal activities of Matthew Williams, specifically with regard to the sale of narcotics.[2] As part of the investigation, Agent Joshua Pike, along with DEA Agent J.T. Scroggs, developed a confidential source ("CS") in Memphis. The CS told the agents that he could purchase methamphetamine from Williams, who resided in San Diego, California.[3] The agents proceeded to monitor several recorded phone calls between the CS and Williams. Based on the information obtained through the phone calls, the agents decided to have the CS attempt to purchase methamphetamine from Williams.

Some time before December 23, 2009, the agents had the CS place an order with Williams, by phone, for one ounce of methamphetamine. Prior to shipment of the methamphetamine, Williams provided the CS with his bank account number. The CS provided the agents with this account number, to which the agents wired payment for the drugs. The CS then told Williams to ship the methamphetamine to an address that had been provided to the CS by

---

[2]Williams became a subject of an investigation by the DEA based on information obtained through a Title III wire tap, which was initiated some time in 2008.

[3]Agent Scroggs was referred to in both parties' briefs as being the other agent involved in the investigation of Williams, but he was not called as a witness at the suppression hearing.

the agents (a vacant house in Memphis).  On December 23, 2009, Williams shipped the package overnight via Federal Express ("FedEx") to the address provided to him by the CS.[4]  On the package, the sender was identified as "Mark Williams" and the recipient was "Dion Williams," which were both fictitious names.[5]  The return address written on the label of the package was a nonexistent address, and the sender's phone number did not belong to Williams.  After shipping the package, Williams provided the CS with the tracking number, who in turn provided the number to the DEA agents.

Agent Pike contacted FedEx's security department to request that the package be secured because it contained narcotics.  DEA agents stationed in San Diego obtained the package from FedEx security, "overboxed" it, and shipped it overnight to Agent Pike.  When the package arrived at the FedEx office in Memphis on December 24, Agent Pike picked it up.  He then brought the package to the local DEA office (which was located in the same building as the FedEx office), where he opened the package and discovered several items, including a bottle of whey protein, a blue shirt, a DVD, an

---

[4]Williams stipulated at the suppression hearing that he was the person who shipped both packages at issue in this motion.

[5]When asked at the hearing whether Mark Williams was an alias used by Matthew Williams, Agent Pike testified that the CS stated that he had no knowledge of Williams ever using that name. Williams did not present any evidence that he was otherwise known as Mark Williams.

electronics kit, and a box with a Christmas ornament. He opened the whey protein bottle and found a plastic baggie containing 27.2 grams of methamphetamine.

In March 2010, the agents had the CS place another order with Williams for one ounce of methamphetamine. This time, the CS (again at the instruction of the agents) told Williams to ship the package to an address in Arlington, Tennessee, which was to another vacant house.[6] This second package was shipped via United Parcel Service ("UPS") and addressed to a "Monica Specking," which was a fictitious name. The packaging label listed the sender's name as "Dion Williams," the return address as being a UPS store in Murrieta, California, and the sender's phone number as some number not connected to Williams. Williams provided the CS with the tracking number for the package. The agents contacted UPS's security department at the UPS hub in Bartlett, Tennessee, and requested that the package be seized upon arrival.[7] On March 23, 2010, the package arrived at the UPS hub in Bartlett. Agent Charles Andrews obtained the package from that location, and upon opening the package, he discovered 27.6 grams of methamphetamine

---

[6]At the hearing, the government did not present any evidence to show that Williams was aware that this address, or the address used for the December 2009 shipment, was to a vacant house. For purposes of deciding Williams's motion, the court will assume that Williams believed the CS would in fact receive the packages at these addresses.

[7]Bartlett is located near Arlington and is the UPS hub for distribution of packages destined for Arlington.

hidden inside a shampoo bottle.

In his Motion to Suppress, Williams argues that the methamphetamine discovered by the DEA agents was obtained as a result of an unlawful search and seizure. In response, the government contends that Williams does not have standing to challenge the constitutionality of the search because he had no legitimate expectation of privacy in the packages. Furthermore, the government argues that the CS's cooperation with the DEA effectively made the DEA the recipient of the packages, and therefore the agents had the authority to open the packages.

## II. PROPOSED CONCLUSIONS OF LAW

Williams's motion and the government's response raise two issues: (1) whether Williams has standing to assert a Fourth Amendment violation based on the DEA agents' search of the packages, and if so, (2) whether the agents nevertheless were authorized to open and search the contents of the packages without a warrant. Williams claims that he had a subjective expectation of privacy in the packages, his expectation was reasonable, and the agents violated his rights when they intercepted the packages and searched them before they arrived at the addresses that appeared on the shipping labels. The government challenges Williams's standing to assert a Fourth Amendment violation because, by using a phony name and false return information, Williams had no legitimate expectation of privacy in the packages once he dropped them off for

shipment.[8] Furthermore, the government argues that even if Williams had a legitimate expectation of privacy in the packages, his privacy interest ended when the packages were received by the DEA.

**A. Williams's Standing to Challenge the Search**

    1.  <u>Williams Had a Legitimate Expectation of Privacy Even Though He Used False Sender Information</u>

The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

<u>U.S. Const. Amend. IV.</u> The Sixth Circuit has recognized that, "[b]ecause Fourth Amendment rights are 'personal,' . . . the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searches or the thing seized." <u>United States v. King</u>, 227 F.3d 732, 743 (6th Cir. 2000) (quoting <u>Rakas v. Illinois</u>, 439 U.S. 128, 140 (1978) and citing <u>Katz v. United States</u>, 389 U.S. 347, 353 (1967)); <u>United States v. Adams</u>, 583 F.3d 457, 463 (6th Cir. 2009); <u>United States v. Waller</u>, 426

---

[8]While the second package listed a real return address (for a UPS office), Williams does not claim that he would have been able to retrieve the package had it been returned to that office.

F.3d 838, 843 (6th Cir. 2005); United States v. McCalebb-Pippens, No. 3:09-CR-64, 2010 WL 2927412, at *7 (E.D. Tenn. May 24, 2010). "Whether a legitimate expectation of privacy exists in a particular place or thing is determined on a 'case-by-case basis'" and involves a two-part inquiry by the court. Adams, 583 F.3d at 463 (quoting King, 227 F.3d at 744). "First, we ask whether the individual, by [his] conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private . . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." Id. (quotations omitted).

The court finds, through Williams's conduct of sealing, labeling, and shipping the packages, that he exhibited an actual expectation of privacy in the contents of the packages. See United States v. Hicks, 59 F. App'x 703, 706 (6th Cir. 2003) (stating that there was no dispute that the defendant exhibited an actual expectation of privacy in the contents of a package by packing and labeling it). "The question [then] is whether his expectation is one that society is prepared to recognize as reasonable." Id. Letters and sealed packages are in the "general class of effects in which the public at large has a legitimate expectation of privacy[,]" and "warrantless searches of such effects are presumptively unreasonable." United States v. Jacobsen, 466 U.S. 109, 114 (1984). It is well-established in the Sixth Circuit that

the sender of a sealed package generally has a legitimate expectation of privacy in the contents of the package while it is en route to its destination. See, e.g., United States v. Warshak, 631 F.3d 266, 285 (6th Cir. 2010) ("While a letter is in the mail, the police may not intercept it and examine its contents unless they first obtain a warrant[.]"); United States v. Alexander, 540 F.3d 494, 500 (6th Cir. 2008) ("[S]ealed packages . . . [are] free from inspection by postal authorities, except in the manner provided by the Fourth Amendment."); Hicks, 59 F. App'x at 706 ("The sender's legitimate expectation of privacy in the contents [of letters and sealed packages] is deemed to continue until delivery."). The sender retains that expectation of privacy until the package is delivered, at which point the expectation of privacy terminates. United States v. King, 55 F.3d 1193, 1196 (6th Cir. 1995). Therefore, under normal circumstances, the sender of a package has standing to assert violations of his Fourth Amendment rights if a law enforcement official intercepts the package and searches its contents before delivery.

The government argues, however, that Williams cannot claim a reasonable expectation of privacy in the packages because he used fictitious names, return addresses, and phone numbers in shipping the packages. There is some case law to suggest that when the sender of a package uses false information in order to make the package unreturnable to him, he effectively disclaims the package

and forfeits his expectation of privacy in the package's contents. These courts apparently consider the sender's actions as a form of abandonment. See, e.g., United States v. Wood, 6 F. Supp. 2d 1213, 1223-24 (D. Kan. 1998) (holding that because the defendant was not the named sender or addressee on the package, and the return address and contact number were not his, he effectively "opted to conceal any purported interest in the package and consciously avoided any public announcement that he had a subjective expectation of privacy in the package. Thus, [the defendant] effectively repudiated his connection to the package and lost the means to exclude others from intruding upon his interest."); United States v. DiMaggio, 744 F. Supp. 43, 46 (N.D.N.Y. 1990) ("The expectation of privacy vanishes, however, when the identity of the sender and intended recipient is not indicated . . . on the package. With respect to the unidentified sender, it is as if the package had been abandoned[.]").[9]

The question of whether a sender relinquishes his privacy interest when he uses false return information to mail a package has not been addressed by the Sixth Circuit. In United States v. Hicks, the district court determined that the defendant's expectation of privacy was no longer reasonable and legitimate "in

---

[9]There is a separate line of cases that addresses a recipient's expectation of privacy when a package is not addressed to him. See United States v. Lozano, 623 F.3d 1055, 1062 (9th Cir. 2010) (O'Scannlain, concurring) (citing cases). The present case, however, involves the sender's expectation of privacy.

the eyes of society" because he (1) shipped a package which met several characteristics of the postal service's "drug package profile" (thus making it likely to arouse suspicion); (2) mailed the package to an address which was not that of the named recipient; and (3) used a false name and return address in mailing the package. 59 F. App'x at 706. On appeal, the Sixth Circuit, while acknowledging that the district court's analysis had some support in the case law, stated that "it is far from clear that the legitimacy of one's privacy expectation can be made to depend on the nature of his activities - innocent or criminal."[10] Id. The court declined to resolve the question of whether the district court's analysis was correct, because it held that even if the defendant had standing to challenge the search, the search was justified under the good faith exception to the exclusionary rule. Id. at 707.

In a Seventh Circuit case, United States v. Pitts, 322 F.3d 449 (7th Cir. 2003), the majority stated that individuals have "a right to use false names in sending and receiving mail." Id. at 459. The facts in Pitts were similar to the instant case, except that the purchaser of the drugs was not working with law

---

[10]A recent case highlights the uncertainty that remains in this area of Fourth Amendment jurisprudence within this circuit. See United States v. Skinner, 690 F.3d 772, 785 (6th Cir. 2012) (Donald, J., concurring) ("While this circuit's law is not well developed on this point, numerous courts have held that privacy expectations are not diminished by the criminality of a defendant's activities.") (citing Hicks and cases from other circuits).

enforcement and he expressly refused to accept delivery of the package. The majority held that the package was abandoned because the sender "launched the package into the stream of mail without any legitimate way of retrieving it" by using a false name and return address, and because the recipient refused to accept delivery and "expressly disavowed the package." Id. at 456-57. The majority stated that "[b]ecause Pitts could not retrieve the package and Alexander refused to accept it, the parcel was abandoned." Id. at 457. In responding to the concurrence, however, the majority emphasized that the expectation of privacy was not forfeited by either defendant simply because they used fictitious names and addresses.[11] Rather, the majority opined that Fourth Amendment rights are only surrendered in such a case when the package is actually abandoned, such as where the sender uses a false return address *and* the recipient refuses to accept delivery. Id. at 459. As explained by the majority:

> The concurrence acknowledges that there are a number of legitimate reasons that a person might wish to send or

---

[11]The concurring judge wrote that "it would be better in today's case to ground our decision on a more solid basis and hold that using phony names, while using the postal system of the United States, does not, except in unusual circumstance not present here, give rise to the sort of personal Fourth Amendment privacy concerns that the Fourth Amendment's exclusionary rule is designed to protect." Id. at 460. These "unusual circumstances," according to the concurrence, would include situations where alter egos or pen names are used in ways that society recognizes as legitimate, such as by Esther Lederer (better known as "Ann Landers") or Pauline Esther Phillips (better known as "Abigail Van Buren" or "Dear Abby"). Id. at 461.

-11-

receive a package using a *nom de plume*. Some authors and journalists, such as the incomparable Ann Landers, whose real name was Eppie Lederer, employ a pseudonym in their professional life. This is a common and unremarkable practice. In other situations, a celebrity may wish to avoid harassment or intrusion; a government official may have security concerns in using her real name or home address to receive mail; a business executive in merger talks might worry about potential investors misusing the information gained through the mail to manipulate the securities markets. Indeed, a sender of mail might wish to remain completely anonymous for any number of reasons. The Supreme Court has held that anonymity of an author is not a sufficient reason to exclude literary works or political advocacy from the protections of the First Amendment. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 341-43 [] (1995). As the Court noted there, an author may decide to remain anonymous for fear of economic or official retaliation, out of concern for social ostracism, or merely because of a desire to preserve as much of one's privacy as possible. McIntyre, 514 U.S. at 341-42[.] So too with the sender or receiver of mail. Yet, because an alias was in this instance used to cloak the identities of the true parties to a narcotics transaction, our colleague concludes that the mailing should have no protection whatever.

There are two possible ways to interpret the concurrence. First, because some people employ an alias and use the mail illegally, everyone with a legitimate reason to remain anonymous should lose their expectation of privacy in the post. Alternatively, only people using an alias for legitimate reasons may retain an expectation of privacy in their mailings while those who employ an alias for illicit purposes may not. Both constructions turn the Fourth Amendment on its head.

The first approach assumes that criminals can forfeit the privacy interests of all persons by using a confidential domain for nefarious ends. Any creative means that a person engaging in illegal activity devises to conceal that fact will lead to the end of privacy for persons engaged in wholly legitimate confidential activities. For example, if persons engaged in illegal drug sales often use hotel rooms for their transactions, or commonly employ cellular telephones to communicate the terms of their deals, then under the concurrence's analysis no one would retain a legitimate expectation of privacy in the

-12-

use of hotel rooms or cellular telephones.

Under the second approach, only criminals forfeit their Fourth Amendment rights. The illegal contents of the package serve as an after-the-fact justification for a search. The concurrence concludes that society is not prepared to accept as reasonable an expectation of privacy in crack cocaine sent through the United States mail by a sender using a fictitious name for himself and his addressee. Of course, the government did not know the package contained crack cocaine until it opened and inspected the box. We may not justify the search after the fact, once we know illegal activity was afoot; the legitimate expectation of privacy does not depend on the nature of the defendant's activities, whether innocent or criminal. If this were the case, then the police could enter private homes without warrants, and if they find drugs, justify the search by citing the rule that society is not prepared to accept as reasonable an expectation of privacy in crack cocaine kept in private homes. Presumably if no narcotics are found (or, as the concurrence speculates, no pipe bombs are found), the owner of the home would be able to bring a civil lawsuit for nominal damages for the technical violation of privacy rights. The Fourth Amendment requires more than this.

Unlike the theoretical burglar in Rakas, who is plying his trade in a summer cabin during the off-season and who is wrongfully present on someone else's property, Pitts and Alexander had a right to use false names in sending and receiving mail. There is nothing inherently wrong with a desire to remain anonymous when sending or receiving a package, and thus the expectation of privacy for a person using an alias in sending or receiving mail is one that society is prepared to recognize as reasonable. A person using this means of maintaining privacy runs the risk that if the mail is undeliverable, as occurred here, it might become irretrievable. Pitts and Alexander took that risk and ended up losing - indeed, abandoning - control of their property. Having abandoned the package, they surrender their Fourth Amendment claim.

Id. at 457-59 (internal citations and footnote omitted); cf. United States v. Robinson, 390 F.3d 853, 873-74 (6th Cir. 2004) (finding

that the defendant had no legitimate expectation of privacy in a FedEx package that was abandoned "because it was delivered to an expired mailbox and [after going unclaimed for thirty days] was subject to disposal or destruction at the time the agents seized it.").

This court agrees with the majority's Fourth Amendment analysis in Pitts. Williams had a reasonable expectation of privacy in the packages even though he used fictitious sender and recipient information.[12] Furthermore, Williams retained that expectation of privacy until the packages were either delivered or rendered undeliverable.

2. Williams Lacks Fourth Amendment Standing Because His Expectation of Privacy Ended When the DEA Agents Received the Packages

The government next argues that even if Williams had a reasonable expectation of privacy in the packages, Williams's expectation of privacy terminated once the DEA agents received the packages. The court agrees. As explained above, a sender's expectation of privacy ends upon delivery. King, 55 F.3d at 1196. It is immaterial whether delivery is made at the address on the shipping label, at the hub, or within a few feet from the counter

---

[12]Of course, as noted by the majority in Pitts, the use of an alias and other fictitious information in sending and receiving mail "is certainly a relevant factor in the 'totality of the circumstances' assessment used to determine whether there is reasonable suspicion or probable cause to believe that criminal activity is afoot." 322 F.3d at 459 n.1.

where a package is dropped off by the sender for shipment. Once a package is received by its recipient - regardless of where that location may be - the package is delivered. Here, Williams could only reasonably expect that his packages would reach the recipient, and unfortunately for him, that recipient turned out to be a CS working for the DEA. That Williams was unaware of the relationship between the CS and the DEA does not negate the fact that the packages were ultimately going to the DEA. As Williams's expectation of privacy ended when the DEA took custody of the packages, Williams lacks standing to assert a Fourth Amendment violation. On these grounds, the Motion to Suppress should be denied.

**B.  The DEA Had Consent to Search the Packages**

Even assuming, *arguendo*, that Williams had standing to challenge the search, the court nonetheless finds that the agents were authorized to search the packages without a warrant because the agents had implied consent from the CS. In <u>United States v. Matlock</u>, 415 U.S. 164, 171 (1974), the Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." In justifying a warrantless search by proof of voluntary consent, the prosecution "is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed

common authority over or other sufficient relationship to the premises or effects sought to be inspected."  Id.  "Common authority is, of course, not to be implied from the mere property interest a third party has in the property[,]" such as that of a landlord in a house that he rents to another.  Id. at 172 n. 7.  Rather, common authority "rests [] on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right and that the others have assumed the risk that one of their number might permit the common areas to be searched."  Id.

While the common authority doctrine set forth in Matlock has generally been applied to warrantless searches of residences and other premises, the Court stated that a third party can have common authority over "effects" as well.  That principle was applied in United States v. Aldridge, 642 F.3d 537, 543 (7th Cir. 2011), where the Seventh Circuit found that the defendant's wife had common authority to consent to a search of a box containing documents, which the defendant had given to his wife with instructions to destroy the documents.  The Seventh Circuit determined that the defendant conferred joint custody over the box and its contents to his wife when he gave it to her unlocked and told her what it contained.  Id.  Likewise, by shipping a package to another with the expectation that the recipient will open it, the sender submits

to the recipient's common authority - if not exclusive authority - over the package.

In this case, the CS had, at the very least, common authority over the packages. As a result, he had authority to consent to the agents' search of them. While it is not entirely clear that the agents ever received express consent from the CS, they at minimum had the CS's implied consent. The present case is similar to <u>United States v. Williams</u>, 106 F.3d 1173, 1177 (4th Cir. 1997). There, a confidential informant made three separate, DEA-monitored purchases of methamphetamine by mail from the defendant. The methamphetamine packages were mailed by the defendant to the informant at a post office box under the control of the DEA. The defendant argued that the agents violated his Fourth Amendment rights by opening the packages without a warrant. The Court of Appeal rejected this argument, holding that

> We are of opinion that the admission of the contents of the three envelopes did not constitute error at all, much less plain error. Even assuming Williams had standing to challenge the admissibility of the envelopes, the record indicates that [the informant's] consent was implied from his conduct during the investigation. [The informant] had the right to open, or given consent to open, the envelopes because they were addressed to him. Also at this time, [the informant] . . . and the Task Force agents who actually opened the packages were cooperating. [The informant] had agreed to buy methamphetamine using government money. . . . We believe this evidence of the relationship between [the informant] and the Task Force agents establishes [the informant's] implied consent. Accordingly, the agents' search of the packages did not violate Williams' constitutional rights as sender of the package.

Id. at 1177-78.  In the instant case, the CS was working for the DEA when he purchased the methamphetamine from Williams.  The CS purchased the drugs using DEA funds, allowed his phone calls to be monitored and recorded by the DEA, instructed Williams to ship the packages to the addresses provided by the DEA, and supplied the agents with the tracking numbers of the packages once they were shipped.  As was the case in Williams, the CS's relationship with the DEA as evidenced by these facts establishes the CS's implied consent to the search.  Accordingly, the agents did not violate Williams's Fourth Amendment rights by searching the packages.

### III. RECOMMENDATION

For the reasons above, the court recommends that the Motion to Suppress be denied.

Respectfully submitted,

s/ Tu M. Pham
TU M. PHAM
United States Magistrate Judge

December 3, 2012
Date

### NOTICE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(c).  FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**